UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------X
FANTASIA DISTRIBUTION, INC.,

                          Plaintiff,         **MEMORANDUM AND ORDER**
                                             20-CV-2378 (KAM)(CLP)

    -against-


COOL CLOUDS DISTRIBUTION, INC., ACCESS
VAPOR, LLC, LIMITLESS TRADING CO., LLC,
POP VAPOR CO., LLC, and ROMEO VAPORS,
INC.,

                          Defendants.
--------------------------------------X

**MATSUMOTO, United States District Judge:**

        Plaintiff Fantasia Distribution, Inc. ("Fantasia"), a California corporation that sells, markets, and distributes e-cigarette, vaping, hookah, and smoking-related products, commenced this action on May 28, 2020 against competitor entities, Myle Vape, Inc. ("Myle Vape"), Cool Clouds Distribution, Inc. ("Cool Clouds"), Access Vapor, LLC ("Access Vapor"), Limitless Trading Co., LLC ("Limitless Trading"), Pop Vapor Co., LLC ("Pop Vapor"), and Romeo Vapors, Inc. ("Romeo Vapors" and together with Myle Vape, Cool Clouds, Access Vapor, Limitless Trading and Pop Vapor, the "Original Defendants"). (ECF No. 1, "Compl.")  In its original Complaint, Plaintiff alleged that the Original Defendants infringed upon the following Fantasia trademarks:  United States Trademark Reg. Nos. 3,998,201 and 4,600,173 (collectively, the "ICE

Trademarks") and United States Trademark Reg. No. 3,812,330 (the "PINK LEMONADE Trademark").  (Compl. ¶¶ 16 – 21.)  Plaintiff subsequently determined that it would not pursue enforcement of the PINK LEMONADE Trademark against all Defendants, (ECF No. 66) and those claims were dismissed on August 19, 2022.  (ECF No. 87.)  Two Defendants, Myle Vape and Access Vapor, brought counterclaims related to the PINK LEMONADE Trademark, and on February 5, 2021, the United States Patent and Trademark Office cancelled the PINK LEMONADE Trademark, rendering all counterclaims seeking cancellation of the PINK LEMONADE Trademark moot.  (ECF No. 97.)  Plaintiff also alleged unfair competition and unfair business practices, pursuant to the Trademark Act of 1946, 15 U.S.C. § 1051 (the "Lanham Act"), as well as unfair competition under New York law. (Compl. ¶ 1.) Plaintiff seeks a permanent injunction that prohibits Defendants from engaging in further infringement of the ICE Trademarks. (*Id.*)  Plaintiff also seeks disgorgement of all profits resulting from the alleged infringement, "three times [the] amount of actual damages," and punitive damages, as well as attorneys' fees and costs, pursuant to 15 U.S.C. § 1117(a).

        The Original Defendants, including the subsequently terminated Defendant, Myle Vape, filed counterclaims alleging, in relevant part, that the ICE Trademarks are based on generic terms that have no significance as a source identifier in the

relevant industry and, accordingly, requesting an order
cancelling the ICE Trademarks. *See* (ECF Nos. 14, "Pop Vapor and
Limitless Trading Answer and Counterclaims" at 20; 17, "Myle
Vape Answer and Counterclaim" at 17; 23, "Access Vapor Answer
and Counterclaim" at 20; 29, "Cool Clouds Answer and
Counterclaim" at 26; 46, "Romeo Vapors Answer and Counterclaim"
at 31.)  On April 4, 2023, Plaintiff and Defendant Myle Vape
stipulated to dismissal of all claims and counterclaims, and
Myle Vape was terminated from this action thereafter.  (ECF No.
95.)  The Defendants that remain are Cool Clouds, Access Vapor,
Limitless Trading, Pop Vapor, and Romeo Vapors (together, the
"Remaining Defendants" or "Defendants".)

Presently before the Court are the remaining parties'
respective motions to disqualify the opposing parties' experts,
pursuant to *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579
(1993).  Plaintiff challenges the testimony of Defendants'
expert on the consumer perception of "ICE," Thomas J. Maronick,
as well as the consumer survey conducted by Maronick, (ECF Nos.
90-2 and 90-3, the "Maronick Survey") and Maronick's analysis of
those survey results (ECF No. 90-1, the "Maronick Report".)
Plaintiff also challenges the testimony of Defendants' marketing
expert, Amy Netherton, as well as Netherton's Declaration (ECF
No. 91-1, "Netherton Decl.")  The Remaining Defendants challenge
the declarations of Plaintiff's expert witness, Julie Trinth, as

3

well as Plaintiff's witnesses, Yousef Nasereddin, Ziad Meziab,
and Sami Romman.[1] (ECF No. 92 at 5 – 26.)

The Court disposes of the parties' respective motions
in turn below, beginning first with Plaintiff's two motions, and
then turning to Defendants' motion.  For the reasons stated
below, Plaintiff's motion to exclude the testimony of
Defendants' expert witness, Thomas Maronick, as well as the
Maronick Survey and the Maronick Report, is **DENIED**.  Plaintiff's
motion to exclude the testimony of Defendants' expert witness,
Amy Netherton, as well as the Netherton Declaration, is **GRANTED**.
Defendants' motion to exclude the declarations of Plaintiff's
expert witnesses is **GRANTED** as to Julie Trinth, and **MOOT** as to
fact witnesses Yousef Nasereddin, Ziad Meziab, and Sami Romman.

BACKGROUND

Fantasia is described, in Plaintiff's Complaint, as a
California corporation "in the nationwide business of selling,
brand marketing, product marketing, and distribution of tobacco,
e-cigarette, vaping, hookah and smoking related products,
including [several products] . . . bearing the distinctive 'ICE'
. . . marks."  (Compl. ¶ 7.)  Plaintiff alleges that

---

[1] Plaintiff proffers the declaration of Julie Trinth as expert testimony, and
specifically as a rebuttal to the testimony of Defendants' expert witness,
Amy Netherton.  Although Defendants challenge the admissibility of
declarations submitted by Yousef Nasereddin, Ziad Meziab, and Sami Romman,
under Fed. R. Evid. 702, Plaintiff asserts in their opposition that these
three witnesses have been proffered as fact witnesses, rather than expert
witnesses.

"considerable resources" have been invested in the marketing of
its brands and trademarks, and that Fantasia enjoys "significant
market recognition" as a result of those substantial
investments.  (*Id*.)  Plaintiff alleges that it began using the
terms covered by the ICE Trademarks, "ice" and "iced," as early
as 2009, and sought to formally register the ICE Trademarks with
the United States Patent and Trademark Office in 2011 and 2014.
(*Id*.)

Defendants Cool Clouds, Pop Vapor, Limitless Trading,
and Romeo Vapors are California corporations that "market[],
distribut[e], offer[] for sale, and/or sell[]" vaping products
bearing the terms "ice" and "iced."  (Compl. ¶¶ 9, 11, 12, 13);
*see also* (ECF Nos. 29 ¶ 9; 14 ¶¶ 11, 12; 46 ¶ 13.)  Access Vapor
is a Florida corporation that "market[s], distribut[es],
offer[s] for sale, and/or sell[s]" vaping products bearing the
terms "ice" and "iced."  (Compl. ¶ 10; ECF No. 23 ¶ 10.)
Plaintiff alleges that "Defendants are Fantasia's competitors"
and that Defendants products which bear the terms covered by the
ICE Trademarks, "ice" and "iced," are "likely to cause consumer
confusion and deceive the public regarding the source,
sponsorship, and/or affiliation of tobacco, e-cigarette, vaping,
hookah and smoking related products."  (Compl. ¶ 21.)
Defendants ask this Court to cancel the ICE Trademarks on the
basis, among other bases, that the terms covered by the ICE

Trademarks, "ice" and "iced" are generic, and based on lack of secondary meaning.  See (ECF Nos. 14 at 19 – 20; 23 at 17 – 20; 29 at 24 – 26; 46 at 29 – 30.)

On September 14, 2021, Plaintiff filed a Pre-Motion Conference letter in anticipation of its motion for summary judgment.  (ECF No. 57.)  Two days later, Defendants filed a Pre-Motion Conference Letter previewing their anticipated cross-motion for summary judgment.  (ECF No. 58.)  In connection to their Pre-Motion Conference Letter and their anticipated summary judgment motion, Defendants filed a statement of undisputed facts, pursuant to Fed. R. Civ. P. 56.1, that included the Defendants' expert witnesses' testimony and exhibits which Plaintiff now seeks to exclude under *Daubert* and Fed R. Evid. 702, the Declaration of Amy Netherton, and the expert report prepared by Thomas Maronick.  (ECF Nos. 59; 59-1.)  Defendants supplemented Maronick's expert report with a copy of the consumer survey on which Maronick's analysis is based and included the survey, as well as a supplement to the survey, and Plaintiff includes these materials as exhibits to its motion to exclude Maronick's testimony.  *See* (ECF Nos. 90-2; 90-3.)

On July 26, 2022, Plaintiff filed a second statement of undisputed facts, pursuant to Fed. R. Civ. P. 56.1, which was supplemented to include discovery exchanged by the parties after the date of Plaintiff's first statement of undisputed facts were

filed on September 14, 2021. (ECF Nos. 80, 57.) Plaintiff's supplemental statement of undisputed facts included declarations from four (4) witnesses, which Defendants challenge in their *Daubert* motion. *See* (ECF Nos. 80-3, the "Trinth Decl."; 80-4, the "Meziab Decl."; 80-5, the "Romman Decl."; and 80-6, the "Nasereddin Decl.")

<u>**LEGAL STANDARD**</u>

**A. Federal Rule of Evidence 702**

Federal Rule of Evidence ("FRE") 702 states that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> **(b)** the testimony is based on sufficient facts or data;
>
> **(c)** the testimony is the product of reliable principles and methods; and
>
> **(d)** the expert has reliably applied the principles and methods to the facts of the case."

"[FRE] 702 guards against the presentation of insufficiently reliable evidence to the fact finder." *Conte v. Newsday, Inc.*, No. 06-CV-4859, 2011 WL 2671216, at *4 (E.D.N.Y. Jul. 7, 2011) (internal citations omitted). The party that proffers the expert testimony or opinion "bears the burden of establishing its admissibility by a preponderance of the

7

evidence." *Aventis Environmental Science USA LP v. Scotts Co.*, 383 F. Supp. 2d 488, 513 (S.D.N.Y. 2005).

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court established the gatekeeping role of the district court in assessing the admissibility of scientific evidence. *Daubert*, 509 U.S. at 589 ("the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.")  "The *Daubert* 'gatekeeping' obligation applies not only to 'scientific' testimony, [however,] but to all expert testimony." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 138 (1999).  The purpose of the gatekeeping requirement is to ensure that the proposed expert "whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152.

District courts have "broad discretion to carry out this gatekeeping function . . . and the types of factors that are appropriate to consider will depend upon the particular circumstances of the particular case at issue[.]" *In re Pfizer Inc. Securities Litigation*, 819 F.3d 642, 658 (2d Cir. 2016). As a general matter, however, "rejection of expert testimony is the exception rather than the rule." *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 306 (S.D.N.Y. 2015) (internal

citations omitted).  The test to admit expert testimony under FRE 702 and under *Daubert* requires an analysis of the following considerations: "(1) whether the witness is qualified to be an expert; (2) whether the opinion is based upon reliable data and methodology; and (3) whether the expert's testimony on a particular issue will assist the trier of fact." *Marini v. Adamo*, 995 F. Supp. 2d 155, 179 (E.D.N.Y. 2014).

### i.   Witness Qualifications

The first prong of the Court's analysis focuses on the witness's qualifications to serve as an expert.  "The initial question of whether a witness is qualified to be an 'expert' is important, among other reasons, because an 'expert' witness is permitted substantially more leeway than 'lay' witnesses in testifying as to opinions that are not 'rationally based on [his or her] perception[.]'" *Nimely v. City of New York*, 414 F.3d 381, 397 n. 11 (2d Cir. 2005).  A witness must demonstrate their "knowledge, skill, experience training, or education" in order to qualify as an expert in the relevant subject matter.  Fed. R. Evid. 702.  "Qualification as an expert is viewed liberally and may be based on 'a broad range of knowledge, skills, and training." *In re Fosamax Products Liability Litigation*, 645 F. Supp. 2d 164, 172 (S.D.N.Y. 2009) (citing *In re TMI Litig.*, 193 F.3d 613, 664 (3d Cir. 1999)).  Even if a court determines a witness to be qualified to offer an expert opinion, however, "[a] witness's qualification on areas of knowledge by no means qualifies him to express opinions outside of this field." *In re Fosamax*, 645 F. Supp. 2d at 202 (citing *Nimely*, 414 F.3d at 399 n. 13).

### ii.  Reliability

Once the Court is satisfied that the proffered witness is qualified to offer expert testimony on the relevant subject matter, the court assesses the reliability of an expert's testimony.  Expert opinions that are "based on data, a methodology, or studies that are simply inadequate to support the conclusions reached" must be excluded as unreliable opinion testimony under *Daubert* and Rule 702.  *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002).  Every step of an expert's analysis must be reliable.  *See United States v. Morgan*, 675 F. App'x. 53, 55 (2d Cir. 2017) ("[i]ndeed 'any step that renders the expert's analysis unreliable under the *Daubert factors renders the expert's testimony inadmissible* as a whole") (internal citations omitted).  In determining whether a step in an expert's analysis or the entirety of the expert's testimony is reliable, the district court considers "[1] the facts on which the expert relies, [2] the method by which the expert draws an opinion from those facts, and [3] how the expert applies the facts and methods to the case at hand."  *Amorgianos*, 303 F. 3d at 267.

### a. Sufficient Facts or Data

With respect to the facts on which the expert relies, FRE 702 requires expert testimony to be "based on sufficient facts or data[.]"  Fed. R. Evid. 702(b).  "Expert opinions based

10

on insufficient facts or data, or on unsupported suppositions [are] not acceptable.  Anecdotal evidence and 'generalized assumptions' are inadequate bases for an expert report." *In re Zyprexa Products Liability Litigation*, 489 F. Supp. 2d 230, 284 (E.D.N.Y. 2007) (internal citations omitted).  Expert testimony should be excluded if it is 'speculative or conjectural.'" *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 638 F. Supp. 3d 227, 242 (E.D.N.Y. 2022) (citing *United States v. Jones*, 965 F.3d 149, 162 (2d Cir. 2020)); *see also R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 248 (S.D.N.Y. 2010) (an expert witness's "subjective belief or unsupported speculation" should be excluded pursuant to FRE 702) (citing *Daubert*, 509 U.S. at 590).

### b. Reliable Methodology

With respect to methodology, "the trial court must decide not only whether an expert's methodology is reliable for some purposes, but whether it is a reliable way 'to draw a conclusion regarding the particular matter to which the expert testimony [is] directly relevant.'" *R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 248 (S.D.N.Y. 2010) (citing *Kumho*, 526 U.S. at 154)).  Among the questions often asked by courts reviewing the methodology employed by an expert "are whether the theory or methodology can be tested, whether it has been subjected to peer review and publication, whether it has a known or potential rate

of error, and whether there is 'general acceptance' of the methodology or theory." *State of New York v. United Parcel Service, Inc.*, No. 15-CV-1136, 2016 WL 4735368, at *4 (S.D.N.Y. Sep. 10, 2016).  The Second Circuit has cautioned, however, that courts "should only exclude [expert] evidence if the flaw [in the expert's reasoning or methodology] is large enough that the expert lacks good grounds for his or her conclusions." *Amorgianos*, 303 F. 3d at 267 (internal citations and quotation marks omitted).  This is because "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

### c. Application of the Methodology to the Underlying Facts or Data

Finally, the reliability prong of "Rule 702 also requires that there be a sufficient[] . . . connection between the methodology and the expert's conclusions for such conclusions to be admissible." *Marini v. Adamo*, 995 F. Supp. 2d 155, 180 (E.D.N.Y. 2014) (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).  Although "the district court may . . . exclude opinion evidence where the court concludes that there is simply too great an analytical gap between the data and the opinion proffered . . . gaps or inconsistencies in the reasoning

leading to the expert's opinion [generally] go to the weight of the evidence, not to its admissibility." *Restivo v. Hessemann*, 846 F.3d 547, 577 (2d Cir. 2017) (internal citations and quotation marks omitted).

### iii. Relevance

With respect to the third and final prong of the FRE 702 analysis, which relates to the relevance of the expert's testimony, courts must assess whether the expert testimony "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. The test for relevance is articulated in FRE 401, which requires that the proffered evidence has a "tendency to make a fact more or less probable than it would be without the evidence." Moreover, expert testimony must also hold "probative value" that is not "substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence[,]" pursuant to FRE 403. In general, questions as to the usefulness of the expert testimony "should [] be resolved in favor of admissibility unless there are strong factors . . . favoring exclusion[.]" *U.S. v. Jakobetz*, 955 F.2d 786, 797 (2d Cir. 1992).

### B. Federal Rule of Civil Procedure 26

Federal Rule of Civil Procedure ["FRCP"] 26 demands that "a party must disclose . . . the identity of any witness it may use at trial to present evidence under [FRE] 702" and that any such disclosure "must be accompanied by a written report – prepared and signed by the witness[.]"  The expert report required under FRCP 26(a)(2)(B) must contain the following:

  (i)  a complete statement of all opinions the witness will express and the basis and reasons for them;

  (ii)  the facts or data considered by the witness in forming them;

  (iii)  any exhibits that will be used to summarize or support them;

  (iv)  the witness's qualifications, including a list of all publications authored in the previous 10 years;

  (v)  a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and

  (vi)  a statement of the compensation to be paid for the study and testimony in the case.

Where a witness is not required to provide a written report, they must still disclose "(i) the subject matter on which the witness is expected to present evidence under [FRE] 702 . . . and (ii) a summary of the facts and opinions to which the witness is expected to testify." Fed. R. Civ. P. 26(a)(2)(C).  Generally, rebuttal reports must be disclosed, "absent a stipulation or a court order . . . within 30 days after the other party's disclosure." Fed. R. Civ. P. 26(a)(2)(D).

"[T]he report setting forth [an] expert's opinions and their factual basis must be 'detailed and complete'." *R.F.M.A.S.,* 748 F. Supp. at 253.  Any supplement to a FRCP 26(a) disclosure must be proffered "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect."  *Id* (citing Fed. R. Civ. P. 26(e)(1)(a)).  Failure to support and disclose an expert report, in accordance with the requirements of FRCP 26, will render a report "presumptively inadmissible."  *Id* at 253 – 54(citing Fed. R. Civ. P. 37(c)(1)).  This presumption can only be overturned by a showing that the failure to disclose was "substantially justified or harmless."  *Id* at 254.

### DISCUSSION

**I. Plaintiff's Motion to Exclude the Testimony of Thomas J. Maronick**

Plaintiff's first motion pursuant to *Daubert* and FRE 702 is a challenge to the testimony of Defendants' expert witness, Thomas J. Maronick, who purports to provide expert insight on consumer perceptions of the relevant terms "ice" and "iced."  Plaintiff's motion to exclude Maronick's opinion is based on three principal assertions concerning the reliability and relevance of the Maronick Survey and the Maronick Report. First, Plaintiff contends that the Maronick Survey "fails to address the sole issue in this case, [whether] the term ICE [is]

15

generic in the vaping industry," or any other issue present in this case, because the Maronick Survey poses the question of whether ice is generally a common term, as opposed to whether the term "ice" is associated with a specific brand in the vaping industry.  (ECF No. 90 at 1.)  Second, Plaintiff contends that whether "the word [ice] is generally viewed by consumers as 'common'" and whether "use of the word ice could possibly be descriptive" are irrelevant, in light of the incontestable nature of Plaintiff's trademark, pursuant to 15 U.S.C. § 1115. (ECF No. 90 at 6, 8.)  Finally, Plaintiff takes issue with the statistical conclusions that Maronick draws from the Maronick Survey, specifically because Maronick "incorrectly concludes that 82% of the respondents believe that ICE [is] a common word[,]" and because according to Plaintiff, "Maronick . . . reaches a conclusion contrary to his own survey evidence and contrary to law."  (ECF No. 90 at 12.)

As noted earlier, when considering a challenge to an expert witness's analysis, under FRE 702 and *Daubert*, the district court assesses "(1) whether the witness is qualified to be an expert; (2) whether the opinion is based upon reliable data and methodology; and (3) whether the expert's testimony on a particular issue will assist the trier of fact."  *Marini*, 995 F. Supp. 2d at 179 (citing *Nimely*, 414 F.3d at 396–97).

### A. Maronick's Qualifications to Serve as an Expert Witness

Plaintiff does not appear to challenge Maronick's qualifications to serve as an expert.  Maronick holds graduate degrees in marketing, management and organizational behavior from the University of Denver and the University of Kentucky, as well as a law degree from the University of Baltimore.  He is a professor emeritus of marketing at Towson University and has worked as Director of the Office of Impact Evaluation for the Federal Trade Commission's Bureau of Consumer Protection.  He has also provided expert testimony in several cases, as it relates to marketing practices, consumer behavior, survey research and deceptive advertising, as well as consumer confusion in the context of trademark cases specifically. (Maronick Survey at 9 – 10.)  The Court finds that Maronick is qualified to provide expert testimony on consumer perceptions of the terms covered by the ICE Trademarks.  Plaintiff's remaining principal assertions, then, focus on the reliability and relevance of Maronick's testimony generally, and the Maronick Survey and Maronick Report in particular.

**B. Reliability of the Maronick Report and the Maronick Survey**

Plaintiff's contentions regarding the sufficiency of the data collected by the Maronick Survey and challenging the connection between the conclusion in the Maronick Report and the facts and methodology underlying the Maronick Report bear on the

17

reliability of the Maronick Survey and the Maronick Report, respectively.

### i. Plaintiff's Allegations that the Questions in the Maronick Survey are Confusing or Incomplete

With respect to the Maronick Survey, Plaintiff asserts that "Maronick specifically decided not to determine if ice was a generic term in the vaping market and instead decided to ask if ice is a common word."  (ECF No. 90 at 3) (internal emphasis omitted).  According to Plaintiff, the Maronick Survey is "poorly designed" in large part because the questions are devoid of the necessary context that would allow for Defendants to "demonstrate that ICE is *generic* for vaping products[.]"  (ECF No. 90 at 4, 5.)  Plaintiff presumably refers to question nine (9) of the Maronick Survey, which asks survey respondents to "indicate . . . which is a common word and which is a brand name" or to select "don't know/not sure" with respect to the following words/terms: Banana Ice, Five Pawns, Ice, JUUL, Mango, Menthol, Naked 100, Pachamama, Pink Lemonade, Raspberry, Strawberry Iced Tobacco, and Vuse.  (Maronick Survey at 4.)  Question ten (10) asks survey respondents who have selected "common word" with respect to the word ice and in response to question nine (9), to specify "why [they said] that 'Ice' is a common word[,]" and offers the following reasons from a drop-down menu: "just is – common name, general name – not brand,

frozen water; ice cubes, everyday usage, means menthol, in
dictionary as noun/adj, different brands use, could be both,
describes flavor, don't know, and miscellaneous." (Maronick
Survey Supplement at 1.)

Plaintiff's concern that the questions in the Maronick
Survey are devoid of the necessary context bears on the
sufficiency of the data collected through the Maronick Survey.
Plaintiff's assertion that the Maronick Survey and Maronick
Report serve only to prove that "the majority of English
speakers would agree that 'ice' is a common word" to refer to
"frozen water" discounts the fact that (1) the population of
survey participants was limited to members of the relevant
consumer group, and that (2) respondents were prompted to draw
explicit comparisons between the relevant terms as 'common
words' and as 'brand names.' (Maronick Report at 4 – 5.)
Moreover, the Maronick Survey meets the standard articulated
within this district for admissibility of survey evidence under
FRE 803(3).

The Maronick Survey was developed to focus on vaping-
product consumers who were capable of distinguishing terms
associated with consumer brands from common, descriptive words.
Maronick pursued this goal by weeding out those individuals who
do not regularly use vaping products and those individuals who
struggle, generally, to make distinctions between brand names

and common words.  *See* (Maronick Survey at 4 – 5) ("respondents

. . . were first asked their age and whether they had vaped an

electronic cigarette or vaping device in the past two months.

[Only] those who met the screening criteria were then provided

with the definition of a 'common word' and a 'brand name' and .

. . asked to identify" unrelated common words and brand names as

an initial test of whether they could "differentiate a brand

name and a [common] word . . . [Then, only] qualified

respondents" were given the opportunity to answer questions

concerning the relevant terms); see also (ECF No. 90-4 at 7)

(the Maronick Survey, "was [] limited to the universe of survey

participants who were active users of vaping products," and

included an explicit comparison between ice as a "common word"

and ice as a "brand name.")  Plaintiff's concerns about the

alleged absence of relevant context for the questions in the

Maronick Survey are, therefore, misplaced.

        Furthermore, the Maronick Survey is admissible

pursuant to FRE 803(3).  The standard for admissibility of

survey evidence includes an assessment of whether "(1) the

'universe' was properly defined, (2) a representative sample of

that universe was selected, (3) the questions to be asked of

interviewees were framed in a clear, precise and non-leading

manner, (4) sound interview procedures were followed by

competent interviewers who had no knowledge of the litigation or

the purpose for which the survey was conducted, (5) the data
gathered was accurately reported, (6) the data was analyzed in
accordance with accepted statistical principles and (7)
objectivity of the entire process was assured."  *Toys R Us, Inc.
v. Canarsie Kiddie Shop, Inc.*, 559 F. Supp. 1189, 1205 (E.D.N.Y.
1983).

      As discussed above, the "universe" for the Maronick
Report was properly defined as consumers of vaping products, and
a representative sample of that universe was targeted and
selected through the use of the two-tier questioning system
described in the Maronick Report.  (Maronick Report at 4 – 5.)
Although Maronick was "retained by attorneys representing e-
cigarette and vaping marketers" for the purpose of this
litigation, there was no mention of the instant litigation, nor
was there any mention of even "the topic of the survey" in the
email invitation to online survey respondents.  (Maronick Report
at 3 – 4.)  Plaintiff has not presented a basis to dispute the
"objectivity" or "accuracy" of the data gathering process
described by Maronick, nor is there reason to believe the
Qualtrics.com internet survey platform or the survey panel
methodology are lacking in the requisite rigor.  The Court
construes Plaintiff's assertion that questions nine (9) and ten
(10) lack the relevant context, as an assertion that "the
questions . . . were [not] framed in a clear, precise and non-

leading manner." *Toys R Us*, 559 F. Supp. at 1205.   Given the two-layer survey process described by Maronick, however, wherein survey respondents who are not regular users of vaping products were excluded from the review population, and given the framing of the questions as an explicit comparison between the relevant terms as common words and as brand names, the Court is satisfied that the Maronick Survey properly assesses survey respondents' impressions of the relevant terms, within the context of vaping products.

Furthermore, the Maronick Survey, as is the case for the "great majority of surveys admitted in this Circuit, including those used in Lanham Act cases," falls into the category of surveys that "poll individuals about their presently-existing states of mind to establish facts about the group's mental impressions[,]" and is therefore exempt from the general rule against hearsay, under FRE 803(3). *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 227 (2d Cir. 1999). Nor is there any risk articulated by Plaintiff, of prejudice or confusion arising from the admission of the Maronick Survey, that outweighs the probative value of either the Maronick Survey or the Maronick Report. *See Bacardi & Co. Ltd. v. New York Lighter Co., Inc.*, No. 97-CV-7140, 2000 WL 298915, at *5 (E.D.N.Y. Mar. 15, 2000) (where a "survey asks respondents 'about their presently-existing states of mind to establish facts about the

group's mental impressions,' such state-of-mind evidence falls
under Rule 803(3) . . . [and] *errors in methodology . . .
properly go only to the weight of the evidence* . . . [subject to
the] balancing of the probative value . . . as opposed to its
likely prejudice or confusion under Rule 403.")

### ii. Plaintiff's Allegations Regarding Maronick's Statistical Conclusions

Plaintiff's allegation that the Maronick Report is
based on a misguided statistical extrapolation from the results
of the Maronick Survey also bears on the reliability of
Maronick's testimony, and specifically whether Maronick drew
conclusions in the Maronick Report that are adequately connected
to the facts and methodology underlying the Maronick Report.
Plaintiff's challenge to the statistical conclusions within the
Maronick Report is a repetition of previously stated concerns
regarding the framing of the questions, rather than a genuine
contention regarding statistical interpretation, sampling, or
extrapolation.

Plaintiff states that Maronick's conclusion that 82%
of survey respondents, and therefore "the vast majority of
respondents in the target market for electronic cigarettes or
vaping devices believe that ice is a common word and not a brand
name" is "completely incorrect for a number of reasons."  (ECF
No. 90 at 10 – 11.)  In listing the "number of reasons,"
Plaintiff again cites the absence of relevant context in the

questions posed to respondents.  (Maronick Report at 10) ("the
survey never asked if 'ice' is a common word for vaping products
or if 'ice' described the product.")  Plaintiff interprets
survey participants' responses to question ten (10), which
Plaintiff alleges further highlights the absence of relevant
context, to somehow discount the reality that 82% of survey
respondents (i.e. 164 out of 200 total respondents) stated, in
response to question nine (9), that they believed "ice" to be a
common name, rather than a brand name.  (*Id.*)

Notwithstanding Plaintiff's dubious statistical
interpretation of the results of question ten (10), this Court
finds that Plaintiff's assertions regarding the statistical
interpretation of the Maronick Survey, as discussed in the
findings section of the Maronick Report, are in fact challenges
to the manner in which the questions were posed to survey
respondents, rather than a challenge to the actual statistical
results of the survey responses.  As discussed above, the Court
finds that the Maronick Survey provides a sufficient factual
foundation for Maronick's expert testimony.  Plaintiff's
assertion of "statistical imperfections . . . affect[] the
weight accorded to the evidence rather than its admissibility."
*Lion Oil Trading & Transp., Inc. v. Statoil Marketing and
Trading (US) Inc.*, No. 08-CV-11315, 2011 WL 855876, at * 4

24

(S.D.N.Y. Feb. 28, 2011) (citing *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 259 (2d Cir. 1987)).

Plaintiff also fails to provide any support from the record for the assertion that the Maronick Report "reaches a conclusion contrary to his own survey evidence," or the assertion that the Maronick Report concedes that Plaintiff enjoys "twenty percent brand recognition" with respect to the term "ice." (ECF No. 90 at 12.) Nor can the Court identify any such support within the Maronick Report or any other part of the record. Because Plaintiff fails to elaborate upon this assertion beyond the quoted statement and because the Court cannot identify any source or support for Plaintiff's contention, Plaintiff has not established a sufficient basis for finding the Maronick Report inadmissible.

### C. Relevance of the Maronick Report

Plaintiffs' assertions regarding the incontestable nature of the Subject Trademarks bear on the relevance of the Maronick Report. Plaintiff alleges that 15 U.S.C. § 1115 lists the limited types of defenses to an "incontestable trademark," and that "demonstrating that the [relevant] word[s] [are] generally viewed by consumers as 'common'" is not a permissible defense under 15 U.S.C. § 1115. (ECF No. 90 at 6.) According to Plaintiff, Defendants' attempt to demonstrate that consumers view ice as a common word "is not at all relevant to any defense

available [to Defendants]. . . [in light of the fact that] it
does not matter what consumers generally think about a word . .
. because incontestability is conclusive evidence that the mark
'ICE' is a brand name."  (ECF No. 90 at 5.)

    As discussed above, the Maronick Survey purports to do
more than demonstrate that the relevant terms are common in the
abstract – the survey asks respondents, vaping-product
consumers, whether they associate the relevant terms with a
brand or whether they think the relevant terms as common,
descriptive words – in other words, whether the survey
respondents view the relevant terms as generic.  The assertion
that a trademark is generic presents a defense, even to an
incontestable trademark, because generic terms cannot be
trademarked in the first place.  The Second Circuit has
repeatedly held that of the "four categories along the spectrum
of possible trademarks: generic, descriptive, suggestive, and
arbitrary or fanciful . . . [a] generic mark . . . receives no
trademark protection."  *Time, Inc. v. Petersen Pub. Co. L.L.C.*,
173 F.3d 113, 118 (2d Cir. 1999) ("while incontestability
relates to a trademark's strength, it does not alter the breadth
of infringement protection that a mark is accorded . . .
registration creates no substantive trademark rights against
infringement beyond the common law rights acquired through use
of the mark"); *see also* G*runer + Jahr USA Pub., a Div. of Gruner*

+ *Jahr Printing and Pub. Co. v. Meredith Corp.*, 991 F.3d 1072, 1075 (2d Cir. 1993) ("[a] generic term is a common name . . . that describes a kind of product [and] [a] common name, available to anyone, is never entitled to trademark protection") (internal citations omitted).

Moreover, Defendants' attempt to present survey data to demonstrate that the relevant terms are common and descriptive is likely to "help the trier of fact . . . to determine a fact in issue." Fed. R. Evid. 702. The assertion that a trademark is a common and descriptive, and, therefore, generic term, if true, is applicable grounds for cancellation of a registered trademark, even one registered under 15 U.S.C. § 1115. This Court finds that because the results of the Maronick Survey and the interpretation of those results in the Maronick Report bear directly on the counterclaims seeking cancellation of the ICE Trademarks and on Plaintiff's claims seeking to enforce the ICE trademarks, both the Maronick Report and the Maronick Survey are relevant under FRE 401 and FRE 403. Plaintiff's incontestability challenge to Maronick's testimony, including the Maronick Survey and the Maronick Report, is misplaced.

As discussed above, the Court finds that the Maronick Survey is both admissible under FRE 803(3) and FRE 702, and that the analysis within the Maronick Report is supported by

27

sufficient data insofar as the analysis is based on the results
of the Maronick Survey.  Plaintiff's challenges to the
methodology employed in the Maronick Survey bear on the weight
of the evidence, rather than its admissibility.  *Schering*, 189
F.3d at 228.  Furthermore, both the Maronick Report and the
Maronick Survey are clearly relevant to the question of whether
the ICE Trademarks are generic and therefore cancellable, which
is the subject of Defendants' counterclaims and a core issue in
the instant action.  Based on the foregoing, it cannot be said
that Maronick "lacks 'good grounds' for his [] conclusions," as
set forth in the Maronick Report or that the Maronick Survey
constitutes "junk science."  *Amorgianos*, 303 F.3d at 267 ("[t]he
flexible *Daubert* inquiry gives the district court the discretion
needed to ensure that the courtroom door remains closed to junk
science while admitting reliable expert testimony that will
assist the trier of fact.")  Plaintiff's motion to exclude the
testimony of Defendants' expert witness, Thomas Maronick, as
well as the Maronick Survey and the Maronick Report is,
accordingly, DENIED.

## II.  Plaintiff's Motion to Exclude the Testimony of Netherton

Plaintiff's second motion pursuant to *Daubert v.
Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), seeks
exclusion of the testimony and declaration of Defendants' expert
witness, Amy Netherton.  (ECF No. 91.)  Plaintiff asserts that

Netherton's testimony "should be excluded under FRE 403 as prejudicial, confusing and misleading, FRE 602 for lack of personal knowledge, FRE 701 as opinion testimony by a lay witness[], [FRE] 702 as failing to be proper testimony by an expert, FRE 703 improper [basis] of an expert's opinion testimony, FRE 802 as hearsay, [and] FRE 901 lack of authenticating evidence." (ECF No. 91 at 1.) Outside of this statement, Plaintiff's motion fails to address or even mention any of the aforementioned Federal Rules of Evidence again, other than FRE 702. Because the Court agrees that Netherton's Declaration and testimony are inadmissible under FRE 702, the Court will not discuss the alternative bases for exclusion, or other Federal Rules of Evidence referenced by Plaintiff.

### A. Netherton's Qualification to Serve as an Expert Witness

First, Plaintiff contends that Netherton is not qualified to serve as an expert. Plaintiff asserts that Netherton "was not even employed in the e-cigarette industry until 2016," (ECF No. 91 at 3) and "should not be allowed to testify as an expert in an industry and on a subject where she is clearly uninformed and unqualified." (ECF No. 91 at 7.) In response, Defendants point out that Netherton "has more than five years of experience working for one of the largest flavor manufacturing companies that makes flavor concentrates for e-

liquids [and] has been called to speak as an industry expert at various industry conferences and before state House and Senate hearings." (ECF No. 91-5 at 2.) Netherton holds a Bachelor of Science from Purdue University and is a "Vice President of Sales and Marketing and Director of Regulatory Affairs" for "Flavor Revolution, LLC . . . [which] manufacturers flavor concentrates that are used to flavor numerous consumable products." (ECF No. 91-6 at 4; Netherton Decl. ¶¶ 1 – 2.)

Defendants, however, have proffered no evidence to support the contention that Netherton is qualified to opine on the chemical composition or features of the flavors or sensations associated with the "ice" effect, either in isolation or, as opposed to, the "menthol" or "mint" effect of various flavor agents. Netherton's Declaration is replete with unsupported statements that are untethered from any evidence. (Netherton Decl. ¶¶ 7, 12 – 14) ("the Koolada cooling agents are not in fact flavors at all – they are flavorless and odorless, yet rather strong in whatever application they are used. Much stronger, in fact, than 'flavors' like traditional mint and menthol"; "so many [] companies have used compounds which contain menthyl menthyl lactate to create the cooling, icy sensation. Chemicals such as WS-23 2-isopropyl-N,2,3-trimethylbutyramide are also used to create the 'ice' flavor"; "[m]enthyl methyl lactate and compounds in this group are

30

entirely different from the compound used to create a menthol flavor . . . menthol is an organic compound made synthetically or obtained from peppermint or mint oils with . . . local anesthetic properties . . . menthol functions as a fortifier for peppermint flavors.")

"To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *U.S. v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004). Netherton's resume indicates that she has an educational background and experience in marketing. (ECF No. 91-2.) Netherton and Defendants, however, fail to provide any basis from which the Court can conclude that Netherton possesses the requisite knowledge, education, experience, or skills to offer an expert opinion on the chemical compounds that create and distinguish the relevant flavors, sensations, and effects. *See R.F.M.A.S.*, 748 F. Supp. 2d at 274 ("The qualifications listed in [the expert] report [perhaps] demonstrate that [the expert] is an expert in marketing . . . but there is no basis on which to infer that [the expert] is knowledgeable about or experienced," as it relates to any other subject at issue). "An expert qualified in one subject matter [here, marketing] does not thereby become an expert for all purposes." *Washington v. Kellwood Co.*, 105 F.

Supp. 3d 293, 304 (S.D.N.Y. 2015).  Netherton's statements in paragraph 7 and paragraphs 12 – 14 of the Netherton Declaration are, therefore, inadmissible under FRE 702.

As to the portion of the Netherton Declaration that purports to describe market trends and successful branding efforts within the relevant industry, such as the market reception of the Koolada agent and the e-liquid brand alleged to have first successfully marketed a flavoring agent analogous to the Koolada agent, Naked 100, (Netherton Decl. ¶¶ 6, 8 – 10) the Court accepts that Netherton, as a marketing professional, is qualified to offer her expert opinion.

### B. Reliability of the Netherton Declaration

Notwithstanding Netherton's qualifications, however, the statements in the Netherton Declaration regarding the Koolada agent and Naked 100 are not supported by either sufficient facts or data, on the one hand, or reliable principles and methodology, on the other hand.  *See Conte v. Newsday, Inc.*, No. 06-CV-4859, 2011 WL 2671216, at *4 (E.D.N.Y. Jul. 7, 2011)(internal citations omitted) ("[u]nder Rule 702, an expert's testimony is admissible if it . . . is (1) 'based upon sufficient facts or data'; (2) 'the product of reliable principles and methods'; and (3) 'the witness has applied the principles and methods reliably to the facts of the case.'")  In assessing the reliability of expert testimony, courts must find

32

that the underlying facts or data on which the expert testimony
relies is sufficient.  Then, the reviewing "court must
determine, at least on a preliminary basis, 'whether the
reasoning or methodology underlying the testimony is
scientifically valid . . . The court must further decide whether
that reasoning or methodology is appropriately applied to the
case at hand and whether the expert is applying it in a manner
that ensures a reliable linkage between the facts . . . and the
[expert's] conclusions." *R.F.M.A.S.*, 748 F. Supp. 2d at 252 –
53 (internal citations omitted).

Netherton's statements regarding the popularity of the
Koolada agent are based on the statements of online messaging
forum participants, which are submitted as Exhibit 1 to the
Netherton Declaration.  (ECF Nos. 91-1 ¶¶ 6, 8; 91-1 at 5 – 35.)
Defendants assert that "Netherton analyzed customer commentary
and relevant publications to provide an opinion on whether 'ice'
is used generally by consumers for certain flavors of e-
liquids."  (ECF No 91-5 at 4.)  Both Defendants and Netherton
fail, however, to specifically identify any relevant facts,
data, or publications that either support Netherton's
descriptions of consumer comments regarding the use of the term
"ice," or that support her conclusory extrapolation from those
comments that "there is no other word in the vaping industry
that describes the addition of a cooling sensation to an e-

33

liquid flavor other than 'ice' or 'icy.'"   (Netherton Decl. ¶
14.)   Nor do Defendants cite or otherwise provide the "several
journal articles on cooling agents" upon which Netherton's
Declaration relies.   (ECF No. 92 at 10.)

Defendants' mention of "customer commentary"
presumably refers to the screenshots from an online messaging
forum included in Exhibit 1 to the Netherton Declaration.
Defendants fail to cite any recognized methodology or sound
principles that support the use of online messaging forums,
without more, to demonstrate that the Koolada agent "became very
popular" in 2013 or thereafter, that vaping products consumers
prefer "[t]he 'ice' effect created by 'Koolada' over "the effect
of a menthol flavor," or that the allegedly "*thousands* of posts
discussing the icy Koolada experience" affirm Netherton's
conclusion that the Koolada experience is, "in essence a cooling
effect" that is distinguishable from menthol or mint-based
flavors and uniquely ascribed to the "ice" or "icy"
sensation(s).   (ECF No. 91-1 ¶¶ 6, 8, 14.)

The parties' discussion of the hearsay rule as it
relates to the comments on the 2013 online messaging board
reflected in Exhibit 1 to the Netherton Declaration
misapprehends the main issue.   The core deficiency in
Netherton's interpretation of the statements contained in the
online messaging board sampled in Exhibit 1 is that neither she

34

nor Defendants provide support for the use of such statements as evidence of the market-level observations she presents.  The Court is not persuaded that individual, online commentary from a sample of "DIY [e-liquid] mixers" in 2013 can serve as an adequate source of data supporting generalized conclusions about the effects and experiences of the relevant flavor agents or the "very popular" market-wide trends impacting "nearly every e-liquid manufacturer."  (ECF No. 91-1 ¶¶ 9, 10, 14.)  The online messaging forums sampled in Exhibit 1 are not the product of rigorous processes and methodology employed in obtaining survey evidence, and therefore do not warrant the same treatment as survey evidence.  *See Schering*, 189 F.3d at 224 - 25 ("under the 'modern view,' . . . surveys should be admitted as a general rule . . . the general trend has been toward the admission of surveys of various kinds.  Surveys are [] routinely admitted in trademark and false advertising cases to show actual confusion, genericness of a name or secondary meaning, all of which depend on establishing that certain associations have been drawn in the public mind.")

"[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (internal citations omitted).  Where, as here, Defendants have failed to proffer reliable principles and methods to support Netherton's proffered expert testimony, the Court may exercise its discretion to find such testimony inadmissible.  Although "the test of reliability is [generally] 'flexible[,]'" *Kumho*, 526 U.S. at 141, Netherton's statements about the 'Koolada' experience are simply too far removed from the data she relies on to support her testimony.  Those statements are, accordingly, inadmissible as expert testimony under FRE 702.

Netherton's statements regarding Naked 100 lack any factual or data-drive support and consequently, are inadmissible.  These statements include the assertion that Naked 100 is "one of the largest and most successful e-liquid brands," that Naked 100 "was the first major manufacturer to release a ready-to-use product that mimicked the 'Koolada' ice sensation . . . in 2016," that "[f]ollowing the success of Naked 100, nearly every e-liquid manufacturer in the industry wanted its own 'ice' flavors,'" and that "'Flavor Revolution received numerous requests from its customers for 'ice' flavors" beginning in 2016.  (Netherton Decl. ¶¶ 9 – 11.)  Though these statements may very well be true, neither Netherton nor Defendants tender any factual support or citations to relevant data to support these assertions.  Netherton's testimony must rest on "more than

subjective belief or unsupported speculation[,]" *Daubert*, 509
U.S. at 599, and "requires some explanation as to how [she] came
to" her conclusions regarding Naked 100.  *Riegel v. Medtronic,
Inc.*, 451 F.3d 104, 127 (2d Cir. 2006).  Because Netherton has
provided no explanation rooted in any facts or data within the
record or otherwise, the Court exercises its discretion to find
that the paragraphs of the Netherton Declaration that relate to
Naked 100 are inadmissible as expert testimony under FRE 702.

Paragraph 7 and paragraphs 12 – 14 of the Netherton
Declaration are inadmissible under FRE 702 because Netherton is
not qualified, as a marketing professional, to opine on the
chemical composition, effects, and sensations of different
flavoring agents.  Paragraphs 6, 8, and 14 of the Netherton
Declaration are also inadmissible under FRE 702 because
Netherton fails to support with sound principles or methodology
her conclusions about consumer preferences and market trends as
it relates to the Koolada agent and the allegedly generic nature
of the terms, "ice" or "icy," which she extrapolates from the
online messaging boards sampled in Exhibit 1 to the Netherton
Declaration.  Finally, paragraphs 9 – 11 of the Netherton
Declaration are inadmissible under FRE 702 because Defendants
have failed to proffer any, much less reliable, facts or data in
support of Netherton's conclusions as they relate to Naked 100.
As the party proffering Netherton's Declaration as expert

37

testimony, Defendants have not met their burden of demonstrating "by a preponderance of the evidence" that their expert witness satisfies the criteria laid out in FRE 702 with respect to the substantive sections of the Netherton Declaration, paragraphs 6 – 14. *Aventis Environmental Science USA LP v. Scotts Co.*, 383 F. Supp. 2d 488, 513 (S.D.N.Y. 2005). Accordingly, paragraphs 6 – 14 are also excluded.

### III. Defendants' Motion to Exclude the Declarations of Julie Trinth, Yousef Nasereddin, Ziad Meziab, and Sami Romman

### A. The Trinth Declaration

In response to the Netherton Declaration, which was proffered by Defendants as expert testimony regarding "the history . . . and [] genericism of the word 'ice' in [the e-cigarette] industry[,]" (ECF No. 92 at 10) Plaintiff submitted the rebuttal Declaration of Julie Trinth on May 16, 2022. (ECF No. 80-3, the "Trinth Decl.") Defendants contend that Trinth is unqualified to serve as an expert on the topic of "genericness," that her Declaration is not based on sufficient facts or data, and that the principles and methods employed by Trinth are unreliable, pursuant to FRE 702. Defendants further contend that the Trinth Declaration "fail[s] to comport with the procedural requirement[s] of Fed. R. Civ. P. 26," (ECF No. 92 at 16) and should be excluded. This Court agrees.

Defendants allege that Plaintiff "failed to provide (i) a complete statement of all opinions [that Trinth] will express and the basis and reasons for them; (ii) the facts or data considered by her in forming them; (iii) any exhibits that will be used to summarize or support them; (iv) her qualifications, including a list of all publications authored in the previous 10 years; (v) a list of all other cases in which, during the  previous 4 years, the witness testified as an expert at trial or by deposition; and (vi) a statement of the compensation to be paid for the study and testimony in the case."  Plaintiff offers no explanation for their failure to comply with FRCP 26(a)(2)(A) – (B).  On this basis, the Court finds that the Trinth Declaration is inadmissible.  *See* Fed. R. Civ. P. 37(c)(1) (where "a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information or witness . . . unless the failure was substantially justified or is harmless.") *See also Hein v. Cuprum, S.A., De C.V.*, 53 F. App'x 134, 136 (2d Cir. 2002) ("the language of Fed. R. Civ. P. 37(c)(1) 'is written in mandatory terms and designed to provide a strong inducement for disclosure of Rule 26(a) material' . . . "Accordingly, [exclusion] under Fed. R. Civ. P. 37 is a matter within the discretion of the trial court") (internal citations omitted).  In any case, because the Trinth Declaration purports to rebut Netherton's

39

testimony, which the Court has excluded pursuant to FRE 702,
"any testimony . . . that relies on [the excluded] analysis must
also be excluded." *Federal Housing Finance Agency v. Nomura
Holding America, Inc.*, No. 11-CV-6201, 2015 WL 539489, at *11
(S.D.N.Y. Feb. 10, 2015).  Defendants' motion to exclude the
testimony of Trinth and the Trinth Declaration is GRANTED.

### B. The Nasereddin, Meziab, and Romman Declarations

        Defendants also contend that Plaintiff's witnesses,
Yousef Nasereddin, Ziad Meziab, and Sammi Romman "failed to
provide an expert report under Fed. R. Civ. P. 26, have provided
no qualifications to purport to be an expert in genericism of
the 'ice' mark, and have provided testimony which fails to
address any issue in [] Netherton's report."  (ECF No. 92 at 22
– 23.)  Defendants point out that the Nasereddin, Meziab, and
Romman Declarations actually predate the Netherton Declaration.
(ECF No. 92 at 23.)  In response, "Plaintiff agrees with
Defendants' assertion . . . that [the Nasereddin, Meziab, and
Romman Declarations] attempt to speak to facts" and asserts that
the statements made by Nasereddin, Meziab, and Romman are,
accordingly, "factual declarations" as opposed to expert
testimony.  The parties are in agreement, therefore, that
Nasereddin, Meziab, and Romman are fact witnesses and that their
declarations are factual in nature.  Because Plaintiffs do not
purport to offer these witnesses as expert witnesses,

Defendants' motion to exclude the Nasereddin, Meziab, and Romman Declarations as expert statements is denied as MOOT. They may, however, testify as fact witnesses if they were identified to Defendants prior to the close of discovery.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion to exclude Netherton's testimony and Declaration is **GRANTED** and Plaintiff's motion to exclude Maronick's testimony, as well as the Maronick Survey and the Maronick report, is **DENIED**. Defendants' motion to exclude the Declarations of Plaintiff's witnesses is **GRANTED** as to Julie Trinth and **MOOT** as to Yousef Nasereddin, Ziad Meziab, and Sami Romman, who are fact witnesses, rather than expert witnesses.

The Court urges the parties to engage in good faith settlement negotiations. To the extent the parties seek to move forward with any motions for summary judgment, which were previewed at the August 19, 2022 Pre-Motion Conference, the parties are respectfully requested to confirm their intended course of action in a joint letter, via ECF, and to include a proposed briefing schedule, by or before September 27, 2023. In their joint letter, the parties are also requested to update the Court on any proceedings before the United States Patent and Trademark Office relating to the ICE Trademarks, if any such proceedings are underway.

On June 29, 2023, this Court adjourned all *Daubert* motion practice in the related matter of *Fantastia Distribution, Inc. v. Magellan Technology, Inc. et al.*, No. 1:20-CV-4340, pending the Court's ruling on the parties' *Daubert* motions in the instant action.  Plaintiff is respectfully requested to serve a copy of this Memorandum and Order on Defendants in *Fantasia Distribution, Inc. v. Magellan Technology, Inc. et al.*, No. 1:20-CV-4340.

**SO ORDERED.**

Dated: September 20, 2023
      Brooklyn, New York

                                         _____
                                         KIYO A. MATSUMOTO
                                         United States District Judge
                                         Eastern District of New York